UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------X
TRAVIS JAMES,

                    Petitioner,                                    <u>MEMORANDUM & ORDER</u>
                                                                   05-CV-4756 (NGG)
          - against -

SUPERINTENDENT SMITH,
Shawangunk Correctional Facility,

                    Respondent.
--------------------------------------------------X
NICHOLAS G. GARAUFIS, United States District Judge.

          *Pro se* petitioner Travis James ("James" or Petitioner") brings this petition for a writ of

habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner is currently incarcerated in Shawangunk

Correctional Facility in Wallkill, New York.  Petitioner challenges his convictions rendered in

New York Supreme Court, Kings County for Murder in the Second Degree (N.Y. Penal Law §

125.25(1)), Criminal Possession of a Weapon in the Third Degree (N.Y. Penal Law § 265.02(4)),

and Criminal Possession of a Controlled Substance in the Third Degree (N.Y. Penal Law §

220.16(1)).  For the reasons set forth below, his petition is denied.

**I.      Factual Background**

          Petitioner admits that, on December 6, 2001 at approximately midnight, he shot and

killed Robbi Alexander ("Alexander") on the corner of Macon Street and Saratoga Avenue in

Brooklyn, New York.  (Petitioner's Memorandum of Law in Support of a Writ of Habeas Corpus

("Pet. Mem.") (Docket Entry # 1) at 4.)  Petitioner fled the scene in an automobile, and a police

chase ensued.  (Id.)  During the chase, Petitioner discarded a nine-millimeter semi-automatic

pistol and magazine, a bag of marijuana, and nineteen Ziploc bags of cocaine from the driver's-

1

side window.  (Id. at 5.)  Petitioner was charged in Kings County with the above counts.

(Assistant District Attorney Diana Villanueva's Affidavit in Opposition to Petition for a Writ of

Habeas Corpus ("Res. Aff.") (Docket Entry # 5) ¶ 5.)  Petitioner admitted to having committed

the crimes but offered the justification of self-defense and the excuse of extreme emotional

disturbance.  (Voir Dire Transcript ("V.D.") at 152.)

### A.    Pre-Trial and Trial

At trial, several witnesses gave testimony implicating Petitioner in the murder: Detectives

David Velez ("Det. Velez"), Steven Taenzer ("Det. Taenzer"), Douglas Lansing ("Det.

Lansing"), and Edwin Latorres ("Det. Latorres"), Police Officer Kenneth Knowd ("P.O.

Knowd"), chemical analyst Leslie Maguet ("Maguet"), ballistics expert Detective Peter Liota

("Det. Liota), and medical examiner Dr. Floriana Pereschino ("Dr. Pereschino").  In addition to

these witnesses,  the victim's mother, Yvonne Alexander ("Ms. Alexander"), Assistant District

Attorney John Castelli ("A.D.A. Castelli"), grand jury stenographer Adrian Febre ("Febre"), and

Detective Kevin Gallagher ("Det. Gallagher") also testified at trial.  Petitioner testified on his

own behalf.

### 1.    Petitioner's Motion to Submit Evidence of the
### Victim's Criminal Record

Before trial, defense counsel moved to introduce evidence of the victim's past

convictions and reputation for violence.  (Id. at 152-52A.)

> MR. FERRIS [defense counsel]: [Petitioner] was aware that the
> deceased, Robbie Alexander . . . had just come home after serving a
> lengthy sentence, I believe somewhere in the neighborhood of five
> years.
>
> THE COURT: Let's argue this tomorrow.

MR. FERRIS: Okay.

THE COURT: I am a little tired right now.  What do you want to get in?

MR. FERRIS: I want to get in the fact that Mr. Alexander does in fact have convictions.

THE COURT: You mean reputation for violence?

MR. FERRIS: Yes.

THE COURT: Yes, but not the convictions.  He is aware of his reputation?

MR. FERRIS: He is.

THE COURT: All right.

(Id.)  The record does not contain further argument on the matter.  During Petitioner's sentencing, defense counsel claimed that he had not been "made privy" to Alexander's full criminal history.  (Sentencing Transcript ("S") at 26.)

## 2. Ms. Alexander's Testimony

After Ms. Alexander was called to testify but before the prosecutor's first question, defense counsel and the prosecutor approached the bench for a discussion held off the record. (Alexander T. at 26.)[1]  Ms. Alexander briefly testified that she had identified her son's body.  (Id. at 26-27.)  Defense counsel declined to cross-examine Ms. Alexander.  (Id. at 27.)

## 3. Testimony of the Officers at the Scene

Dets. Velez, Taenzer, and Lansing testified that, along with Sergeant Scott Havner ("Sgt.

---

[1] "T." refers to the trial transcript.  The name preceding "T." refers to the witness testifying.

Havner"), they passed the intersection of Macon Street and Saratoga Avenue at around midnight on December 6, 2001, while riding in an unmarked police car. (Velez T. at 28-30, 39; Taenzer T. at 46; Lansing T. at 60.) Each officer noticed a group of people outside a corner grocery store. (Id.) The officers testified that, after continuing further down the block, stopping, and getting out of the vehicle on an unrelated matter, they heard the sounds of several gunshots originating from the above intersection. (Velez T. at 31; Taenzer T. at 46-47; Lansing T. at 57.) The officers further testified that Petitioner drove a Ford Explorer towards them, they blocked the Explorer and identified themselves, and Petitioner opened the driver's-side door but then closed the door and fled. (Velez T. at 32; Taenzer T. at 47-48; Lansing T. at 58-59.)

Dets. Taenzer and Lansing chased the Explorer on foot while Det. Velez and Sgt. Havner gave chase in their vehicle. (Taenzer T. at 48; Lansing T. at 59; Velez T. at 33.) Det. Taenzer testified that, while in pursuit, he observed the Explorer slow down around 544 MacDonough Street, and Det. Lansing testified that he recovered a nine millimeter semi-automatic pistol from that site. (Taenzer T. at 49; Lansing T. at 61.) Det. Lansing further testified that neither the weapon nor the magazine contained ammunition.[2] (Id. at 64.) Det. Velez testified that Petitioner stopped near the corner of Malcolm X Boulevard and Bainbridge Street and threw a bag of marijuana and nineteen Ziploc bags of cocaine from the Explorer's window.[3] (Velez T. at 35.) Det. Velez testified that Petitioner exited the vehicle but that Petitioner did not comply with the detective's commands. (Id.) Det. Velez then tackled Petitioner to the ground, injuring

---

[2] Det. Peter Liota testified that the gun was operable, could hold twelve rounds, and that its cartridge and magazine had been emptied. (Liota T. at 187.)

[3] Leslie Maguet confirmed that the substances in the bags were cocaine and marijuana. (Maguet T. at 112.)

Petitioner's chin.  (Id. at 36.)

Det. Lansing testified that other police officers were near the corner of Malcolm X Boulevard and Bainbridge Street, including a gang unit officer who wore a shirt bearing the words "Brooklyn Gang."  (Lansing T. at 65.)  At trial, defense counsel requested a sidebar conference.  (Id.)  At this sidebar, defense counsel referred to an off-the-record discussion directly preceding Ms. Alexander's testimony at which the trial court refused to allow defense counsel to ask Ms. Alexander if she and her son were members of the Bloods gang.  (Id. at 66.)  Defense counsel argued that, because Det. Lansing testified that gang-unit officers were present, the prosecutor had opened the door to questioning Ms. Alexander about her and her son's alleged gang involvement.  (Id. at 67.)  The trial court denied defense counsel's application.  (Id. at 67-68.)

After the sidebar conference, Det. Lansing further testified that Petitioner repeatedly stated, "I didn't do it, but Robbi deserved it."  (Id. at 70.)  Petitioner also stated that the shooting was "Blood and Crip nonsense" and that, although he was not a member of the Crips gang, people often assumed he was a member due to his unfortunate nickname "Crip" – a description of his disability.  (Id. at 69, 82-83.)

P.O. Knowd, who arrived at the scene of the shooting within minutes of the incident, testified that he observed the "victim lying face-down on the sidewalk."  (Knowd T. at 91.)  Det. Latorres, who was also called to the scene, recovered numerous shell casings and two bullets from the scene.  (Latorres T. at 128-130.)   Det. Peter Liota testified that the shell casings and bullets recovered were discharged from Petitioner's gun.  (Liota T. at 187.)  Det. Gallagher was also called to the scene.  (Gallagher T. at 299.)  He searched the scene for weapons but did not

find any.  (Gallagher T. at 229; Latorres T. at 128; Knowd T. at 92.)  Det. Gallagher did not find

any weapons on the victim after searching his body.  (Gallagher T. at 230.)  Dr. Pereschino

testified that the victim had a 0.14 percent blood alcohol content and that the victim's body had

nine entry wounds.  (Pereschino T. at 215-19.)

### 4. Testimony about Events Following the Shooting

The following morning, Det. Gallagher interrogated Petitioner, whereupon he noticed that

Petitioner had a deformed leg and limped.  (Gallagher T. at 234, 266.)  Det. Gallagher testified

that Petitioner initially claimed only to have heard shots and fled but, after Det. Gallagher

pointed out to Petitioner that police would examine the recovered gun for fingerprints, Petitioner

stated, "I'm sorry.  I didn't mean to shoot him.  I wish I wasn't there."  (Id. at 239-42.)  Petitioner

then confessed to killing Alexander and wrote a statement describing his account of the crime,

the preceding events, and his relationship with Alexander.  (Id. at 244-55.)  Later that afternoon,

A.D.A. Castelli interrogated Petitioner and videotaped Petitioner's oral statement of confession.

(Id. at 256; Castelli T. at 115-20.)

At trial, Det. Gallagher read from Petitioner's written statement, the prosecutor played

Petitioner's videotaped statement during A.D.A. Castelli's testimony, and a grand jury

stenographer read Petitioner's grand jury testimony.  (Gallagher T. at 249-54, Castelli T. at 119;

Febre T. at 139-80.)

According to these statements, Petitioner met Alexander in the early 1990s when

Petitioner began dating Kim Royster ("Royster"), who lived in Alexander's building.  (Febre T.

at 151-52; Gallagher T. at 249.)  Alexander wanted to date Royster, but she was not receptive to

his advances.  (Febre T. at 152.)  Petitioner often told Alexander to leave Royster alone and

Alexander responded by taunting Petitioner.  (Id. at 153; Gallagher T. at 243, 249.)  After one

such exchange in 1994, Alexander warned Petitioner saying, "[D]on't let me catch you, you Crip

mother fucker."  (Gallagher T. at 249-50.)  One week later, Alexander and his friends menacingly

approached Petitioner, whose disability prevented him from fleeing.  (Febre T. at 155; Gallagher

T. at 250.)  Someone in the group hit Petitioner in the back of the head, knocking him

unconscious.  (Febre T. at 145-46, 154-55; Gallagher T. at 243, 250.)  When Petitioner awoke in

Kings County Hospital, he learned that he had been stabbed sixteen times with an icepick and

that his lung had collapsed.  (Febre T. at 145-46, 154-55; Gallagher T. at 243, 250.)  Fearful of

further consequences, Petitioner lied to police when he said that he did not know who stabbed

him.  (Febre T. at 154-55; Gallagher T. at 250.)

Petitioner continued to fear Alexander, who had been "in and out of jail" for shootings,

for gang involvement, and for possessing firearms.  (Febre T. at 145, 153; Gallagher T. at 250.)

Petitioner explained that Alexander was sent to prison in 1994 for his involvement in a robbery

and shooting.  (Febre T. at 145, 153-55; Gallagher T. at 250.)  According to Petitioner, police

chased Alexander, who had just committed the robbery, to Alexander's grandmother's house

and, from that location, the police recovered several of Alexander's firearms.  (Id.)  While

Alexander was in prison, he continued to threaten Petitioner by relaying to others that he was

going to "fuck [Petitioner] up."  (Febre T. at 155-56, 172; Gallagher T. at 250.)  Upon hearing in

October 2001 that Alexander would soon be released from prison, Petitioner purchased a gun for

protection.  (Febre T. at 156-57, 164.)  Petitioner stored the gun at his sister's apartment without

once removing it until December 5, 2001, the day of the shooting.  (Id.)

At around 7:30 p.m. on that day, Petitioner drove to his daughter's grandmother's

apartment to pick up his daughter.  (Id. at 144-45.)  There he saw Alexander with "some Bloods."  (Id. at 144.)  Alexander told the Bloods members, "I should hurt him."  (Id. at 145.)  Petitioner believed that Alexander was referring to him.  (Id.)  To avoid further confrontation, Petitioner did not leave his car.  (Id.)  Later that evening, Petitioner and his friend Jamal Williams ("Williams") went to a local pool hall.  (Febre T. at 145; Gallagher T. at 251.)  Alexander and other gang members appeared.  (Febre T. at 145; Gallagher T. at 251-52.)  Alexander exclaimed, "I will hurt them," while staring at Petitioner and Williams.  (Febre T. at 146; Gallagher T. at 252.)  Before Alexander left the pool hall, he said loudly, "I'll be back.  I am going to kill these motherfuckers.  I'm going to get my gun."  (Febre T. at 147, 156, 158, 163-65.)

Petitioner, thinking about the stabbing and aware of the rumor that Alexander owned guns, decided to go to his sister's house to retrieve his own gun.  (Id. at 147, 153.)  Petitioner loaded the gun with five bullets, returned to the pool hall, and shortly thereafter left with Williams.  (Id. at 147-48.)  Williams asked to be dropped off at the corner of Macon Street and Saratoga Avenue.  (Febre T. at 148; Gallagher T. at 253.)  Petitioner exited the vehicle at the corner to say hello to friends when, suddenly, Alexander appeared and accosted Petitioner.  (Febre T. at 149; Gallagher T. at 253.)  Petitioner reminded Alexander that he had not implicated him in the 1994 stabbing.  (Febre T. at 149.)  Alexander, however, threatened to kill Petitioner, his children, and Royster on the following day unless Petitioner killed Alexander that night.[4]  (Id.

---

[4] In his written and videotaped statements, Petitioner did not mention Alexander's threat to kill his children and Royster.  (Febre T. at 170.)  Petitioner first mentioned this threat while testifying before the grand jury.  (Id. at 150, 170.)

at 149, 169-170.)  Alexander then hit Petitioner in the chin and cut him with a sharp object.[5]  (Id. at 149, 171, 180.)  Petitioner, physically disabled and incapable of fleeing, then "blanked out" and shot Alexander to death.  (Id. at 150, 174-75, 179-180; Gallagher T. at 253-54.)

On cross-examination, defense counsel attacked Det. Gallagher's investigation.  Det. Gallagher testified that, during his investigation, he had not interviewed Williams or Royster, nor had he searched Kings County Hospital medical records to find the record of Petitioner's 1994 admittance for stab wounds, nor had he located the police report for the shooting.  (Gallagher T. at 260, 268-69, 283-84.)  Defense counsel, who had, in fact, located those documents, submitted them into evidence.  (Id. at 283-85.)  The trial court sustained the prosecutor's objection to defense counsel's question as to whether Alexander had ever been arrested outside the eighty-first precinct, Det. Gallagher's jurisdiction.  (Id. at 270.)  The trial court further precluded defense counsel from asking Det. Gallagher whether Alexander had a reputation for violence.  (Id.)  When asked whether Det. Gallagher investigated Petitioner's allegation that Alexander was a member of the Bloods gang, Det. Gallagher responded that "a records search" for Alexander's gang membership yielded no result.  (Id. at 271.)

Det. Gallagher acknowledged that he was familiar with a memorial that had been spray-painted near the scene of the shooting.  (Id. at 272.)  Although he remembered that the memorial bore the words "RIP Robbi," he did not remember if the memorial mentioned the Bloods gang.  (Id.)  Defense counsel attempted to submit into evidence a photograph of the memorial bearing

---

[5]  In his written and videotaped statements, Petitioner alleged that police officers injured his chin while arresting him and did not mention Alexander's attack.  (Febre T. at 163-65; Gallagher T. at 254.)  Petitioner first alleged that Alexander cut Petitioner's chin with a sharp object when Petitioner testified before the grand jury.  (Febre T. at 149, 171, 180.)

the words "Blood for Life" in red spray paint in response to Det. Gallagher's testimony. (Id. at 299-302.) The trial court prohibited defense counsel from introducing the photograph through Det. Gallagher despite defense counsel's insistence that the photographer was unwilling to testify for fear of retaliation. (Id. at 301-02.)

### 5. Petitioner's Testimony

Petitioner testified on his own behalf at trial, repeating the statements he made in his written and videotaped confessions and in his testimony to the grand jury. He also testified that Alexander was a member of the Bloods gang, had shot individuals, had "blown up" buildings, and had been imprisoned for possessing firearms. (James T. at 309-310.) Petitioner admitted that he initially lied to Det. Gallagher when he told him he did not shoot Alexander. (Id. at 318.) Furthermore, Petitioner explained that Det. Gallagher had told him that the police had found no weapons on Alexander, and he therefore lied to the grand jury about Alexander's hitting and cutting him, in order to bolster his defense. (Id. at 320-22.)

### 6. Parties' Summations

During summation, defense counsel emphasized the importance of Petitioner's state of mind during the shooting as it related to Petitioner's affirmative defenses of self-defense and extreme emotional disturbance. (T. at 394, 396.) Pointing to Petitioner's belief that Alexander would use deadly physical force against him and to Petitioner's emotional distress at the time of the shooting, defense counsel noted (1) that Alexander stabbed Petitioner in 1994, (2) that Petitioner knew Alexander had been imprisoned after a conviction for a crime involving a gun, (3) that, while in jail, Alexander continued to taunt and threaten Petitioner, (4) that, on the night of the shooting, Alexander threatened Petitioner and announced that he would get his gun, and

finally, (5) that Alexander precipitated the shooting by confronting Petitioner. (Id. at 398-400, 403, 405, 417-18.)

The prosecutor, in delivering her summation, stressed the importance of truth-telling and said that Petitioner had lied. (Id. at 424, 429.) She pointed out that Petitioner admitted to lying to Det. Gallagher about not having shot Alexander and to lying to the grand jury about Alexander's having used a sharp object to cut Petitioner's chin. (Id. at 429.) The prosecutor suggested that Petitioner, at trial, lied about several other facts supporting his defense, such as Petitioner's claim that Alexander assaulted him in 1994, Petitioner's knowledge that Alexander "blows up" buildings, and Petitioner's claim that Alexander threatened to retrieve his gun on the night of the shooting. (Id. at 434, 436, 439.) Further highlighting Petitioner's dishonesty with metaphor, the prosecutor stated that "the Academy Awards came a little bit early." (Id. at 428.) The trial court sustained defense counsel's objection to this statement. (Id. at 428-29.) When the prosecutor referred to Petitioner as "a calculating and manipulative liar . . . [who] thinks he can probably sell sand to people that live in a desert," defense counsel did not object. (Id. at 429.)

Additionally, the prosecutor stated that Petitioner lied while engaging in the "character assassination" of Alexander. (Id. at 428.) To this statement too, the trial court sustained defense counsel's objection. (Id. at 428-29.) However, the trial court overruled defense counsel's objection to the prosecutor's characterization of Petitioner's testimony as an attempt to "dirty [Alexander] up." (Id. at 445.) Finally, the prosecutor suggested that Petitioner lied about Alexander's gang affiliation since Alexander was not wearing any red bandanas or gang tattoos indicative of Bloods membership. (Id.) Neither of these two facts were in the record. (Pet. Mem. at 15.)

### 7.     Extreme Emotional Disturbance Jury Charge

The trial court instructed the jury that "it is the convincing quality of the testimony that controls, not the amount of testimony or the number of witnesses testifying for either side" when addressing the overall issue of witness credibility.  (T. at 456.)  Later, when administering the jury charge regarding Petitioner's extreme emotional disturbance defense, the trial court did not include such language.  (T. at 478.)  In its extreme emotional disturbance charge, the trial court instructed only that a preponderance of the evidence must be of "sufficient convincing quality in your judgment as to outweigh evidence to the contrary." (Id. at 478.)  When the jury requested clarification, the trial court repeated the same instruction.  (Id. at 502-03.)  Petitioner further alleged that, following the verdict, jury members told defense counsel that they believed Petitioner needed to produce witnesses other than Petitioner to prove extreme emotional disturbance by a preponderance of the evidence.  (Pet. Mem. at 38.)

### B.     Conviction and Post-Conviction Appeals

On April 25, 2002, Petitioner was found guilty of the crimes charged.  On May 14, 2002, the trial court sentenced Petitioner to a minimum of twenty-two years and a maximum of life imprisonment for the charge of murder in the second degree.  For the remaining charges, the trial court sentenced Petitioner to lesser terms of imprisonment, which were to run concurrently with each other and with the sentence for murder in the second degree.  Petitioner is currently incarcerated pursuant to this judgment of conviction.

On October 21, 2003, the Petitioner filed a timely Notice of Appeal.  In his brief to the Appellate Division, Second Department, Petitioner raised four issues: (1) that the trial court refused to allow evidence of the victim's criminal convictions and gang affiliation; (2) that the

prosecutor made several improper comments during summation; (3) that the trial court omitted a crucial part of the jury charge on extreme emotional disturbance; and (4) that the sentence imposed was excessive. (Brief for Defendant-Appellant ("App. Br.") at i-ii.) The Appellate Division affirmed Petitioner's conviction, holding as follows:

> The defendant failed to preserve for appellate review the claimed instances of prosecutorial misconduct raised on appeal, and we decline to review them in the exercise of our interest of justice jurisdiction. In any event, the defendant was not deprived of a fair trial as a result of prosecutorial misconduct.
>
> The defendant's claim of error in the court's charge on the affirmative defense of extreme emotional disturbance is similarly unpreserved for appellate review. In any event, the contention is without merit, as the court's charge, when read as a whole, "adequately conveyed the legal principles to be applied by the jury in determining whether the defendant had proven by a preponderance of the evidence that he had acted under an extreme emotional disturbance."
>
> The sentence imposed was not excessive.
>
> The defendant's remaining contentions are without merit.

People v. James, 775 N.Y.S.2d 561, 561-62, 6 A.D.3d 726, 726-27 (N.Y. App. Div. 2d Dep't 2004) (citations omitted). On May 14, 2004, Petitioner sought leave to appeal to the New York Court of Appeals, raising the same issues he had raised in his brief to the Appellate Division. The New York Court of Appeals denied Petitioner leave to appeal on July 7, 2004. People v. James, 816 N.E.2d 575, 575, 3 N.Y.3d 660, 660 (N.Y. 2004). The instant petition for a writ of habeas corpus followed.

## II.     Discussion

### A.     Standard of Review

The Anti-Terrorism and Effective Death Penalty Act ("AEDPA") sets forth the standard of review for habeas corpus petitions which have been fully adjudicated on the merits.  For claims that have been fully adjudicated on the merits in state court, a petitioner must show that the state court proceedings:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); see Mask v. McGinnis, 252 F.3d 85, 90 (2d Cir. 2001) (per curiam) (holding that habeas relief is warranted "only upon a showing that the state courts unreasonably applied clearly established *Supreme Court* precedent") (emphasis in original).

In assessing the "contrary to" provision, the Supreme Court has held that a state court's decision is contrary to clearly established Supreme Court precedent "if the state court applies a rule that contradicts the governing law set forth in [the Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the] Court and nevertheless arrives at a result different from [the Court's] precedent."  Williams v. Taylor, 529 U.S. 362, 412 (2000).  The "unreasonable application" prong is implicated "if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies it to the facts of the particular state prisoner's case."  Id. at 407.  In this analysis, a determination of the reasonableness of the application of the law is done from an objective, rather than subjective, standpoint.  Id. at 409-410.  Accordingly, "a federal habeas court may not

issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established Federal law erroneously or incorrectly. Rather, that application must also be unreasonable." <u>Id.</u> at 411. The U.S. Court of Appeals for the Second Circuit has warned, however, that while "[s]ome increment of incorrectness beyond error is required . . . the increment need not be great; otherwise habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." <u>Francis v. Stone</u>, 221 F.3d 100, 111 (2d Cir. 2000) (internal quotation marks and citations omitted).

Once constitutional error is found, the habeas court must engage in harmless error review. In order to be entitled to habeas relief, Petitioner must demonstrate that any constitutional error "had substantial and injurious effect or influence in determining the jury's verdict" and that the error resulted in "actual prejudice." <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637 (1993) (internal citation and quotation marks omitted). If the error "was harmless beyond a reasonable doubt," then a writ of habeas corpus is not warranted. <u>Chapman v. California</u>, 386 U.S. 18, 24 (1967); <u>see also</u> <u>Santana-Madera v. United States</u>, 260 F.3d 133, 140 (2d Cir. 2001) (noting that the <u>Chapman</u> standard is more relaxed than the <u>Brecht</u> standard and observing that "[n]either the Supreme Court nor this Court has definitively established the proper harmless error standard to apply when a constitutional error is being evaluated for the first time on collateral review"). The creation of otherwise non-existent reasonable doubt test applies post-AEDPA. <u>Wade v. Mantello</u>, 333 F.3d 51, 59 (2d Cir. 2003).

**B.    Petitioner's Claims**

Petitioner raises three challenges to his state court conviction on habeas review. First, he alleges that the trial court's refusal to allow evidence of the victim's criminal convictions and

gang affiliation deprived him of his Sixth and Fourteenth Amendment rights to present a complete defense. (Pet. Mem. at 19.) Second, Petitioner alleges that prosecutorial misconduct during summation deprived him of his Fourteenth Amendment due process right to a fair trial.[6] (Id.) Finally, Petitioner alleges that the trial court's omission of a part of the jury charge on extreme emotional disturbance deprived him of his Fourteenth Amendment due process right to a fair trial. (Pet. Mem. at 35.)

### 1.      Erroneous Evidentiary Rulings

The Appellate Division held that Petitioner's challenge to the trial court's refusal to admit evidence of the victim's prior criminal convictions and gang affiliation was "without merit." James, 775 N.Y.S.2d 561 at 561, 6 A.D.3d at 727. Therefore, review of this claim is governed by Section 2254(d)(1) of AEDPA and the "unreasonable application of clearly established federal law" standard.[7] See Williams, 529 U.S. at 404-406. Applying this standard, Petitioner's evidentiary ruling claim is denied.

"Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution

---

[6] In his memorandum, Petitioner included the prosecutorial misconduct argument as a part of the larger complete defense argument. (See Pet. Mem. at 19, 28.) This court will analyze the arguments separately because a different body of law has developed for each of the distinct issues. See infra.

[7] This court finds that this claim was fully adjudicated on the merits by the Appellate Division and is therefore subject to deference under AEDPA. See Sellan v. Kuhlman, 261 F.3d 303, 312 (2d Cir. 2001) ("For the purposes of AEDPA deference, a state court 'adjudicate[s]' a state prisoner's federal claim on the merits when it (1) disposes of the claim 'on the merits,' and (2) reduces its disposition to judgment. When a state court does so, a federal habeas court must defer in the manner prescribed by 28 U.S.C. § 2254(d)(1) to the state court's decision on the federal claim – even if the state court does not explicitly refer to either the federal claim or to relevant federal case law.").

guarantees criminal defendants a meaningful opportunity to present a complete defense." <u>Crane v. Kentucky</u>, 476 U.S. 683, 690 (1986) (internal citations and quotation marks omitted); <u>see also</u> <u>Chambers v. Mississippi</u>, 410 U.S. 284, 294 (1973) ("The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations."). However, "federal habeas corpus relief does not lie for [mere] errors of state law." <u>Estelle v. McGuire</u>, 502 U.S. 62, 68 (1991). Also, the Constitution affords judges "'wide latitude' to exclude evidence that is 'repetitive . . . , only marginally relevant' or poses an undue risk of 'harassment, prejudice, [or] confusion of the issues.'" <u>Crane</u>, 476 U.S. at 689-690 (quoting <u>Delaware v. Van Arsdall</u>, 475 U.S. 673, 679 (1986)). The Constitution does not limit "the power of States to exclude evidence through the application of evidentiary rules that themselves serve the interests of fairness and reliability – even if the defendant would prefer to see that evidence admitted." <u>Id.</u> at 690. Likewise, a trial court may place restrictions on a defendant's presentation of evidence without offending the Constitution so long as those restrictions serve "legitimate interests in the criminal trial process . . . [and are not] arbitrary or disproportionate to the purposes they are designed to serve." <u>Rock v. Arkansas</u>, 483 U.S. 44, 55 (1987).

### a. Documentary Evidence of Victim's Criminal Record

Petitioner first argues that the trial court, in violation of Petitioner's constitutional right to present a complete defense, prohibited defense counsel from placing documentary proof of Alexander's criminal record in evidence. (Pet. Mem. at 23.) In New York, a criminal defendant offering a justification defense may "introduce evidence of the victim's prior specific acts of violence of which the defendant had knowledge, provided that the acts sought to be established

are reasonably related to the crime of which the defendant stands charged." People v. Miller, 349

N.E.2d 841, 847 (N.Y. 1976). In Williams v. Lord, 996 F.2d 1481, 1483 (2d. Cir. 1993), the

Second Circuit held that the Miller rule is constitutional; in Williams, the Second Circuit applied

the Rock standard to circumstances similar to that of the instant case. 996 F. 2d at 1483 (noting

that the Miller rule serves the legitimate state interests of preventing the jury from overvaluing

the evidence and preventing the jury's undue diversion to collateral matters, and that these

interests are neither arbitrary nor disproportionate to the defendant's right to present a complete

defense). Thus, a habeas court may find constitutional error only where it can find demonstrable

error in the Miller rule's application. As a threshold matter, any part of Alexander's criminal

record of which Petitioner had no knowledge at the time of the shooting is properly excluded

pursuant to Miller.

As for documentary evidence of Alexander's past convictions that corroborate

Petitioner's knowledge at the time of the shooting, the record demonstrates that defense counsel

made no specific request to introduce *documentary* evidence of Alexander's criminal record.

Defense counsel merely sought to introduce evidence of Alexander's reputation for violence and

unspecified evidence of Alexander's convictions of which Petitioner was aware at the time of the

shooting. (See V.D. at 152-152A.) Petitioner points to defense counsel's statement during

Petitioner's sentencing that he had not been "made privy" to Alexander's criminal record and

thus posits that it can be gleaned that the trial court, at some point, off the record, denied defense

counsel's motion to introduce documentary evidence. (Pet. Mem. at 23.) However, such claims

are merely speculative and unsupported by the state-court record. Upon the record before this

court, I find no evidence that defense counsel sought to introduce such documentary evidence

18

and, thus, find no error.

### b. Testimonial Evidence of the Victim's Prior Specific Acts of Violence

Petitioner argues that the trial court not only excluded documentary evidence of Alexander's criminal record in an off-the-record ruling but that the trial court also excluded all testimonial evidence of Alexander's prior specific acts of violence. (Pet. Mem. at 23.) However, it is clear from the record that the trial court made no such expansive ruling. Petitioner had an opportunity to present evidence regarding Alexander's specific acts of violence including those leading to criminal convictions. Petitioner testified that Alexander stabbed him in 1994, that Alexander was convicted and imprisoned for illegally possessing firearms, that Alexander was a Bloods gang member, that Alexander carried guns, and that Alexander had "blown up" buildings. (James T. at 306-07, 309-10.)

Petitioner further argues that the trial court erred when it precluded defense counsel's question to Det. Gallagher as to whether Alexander had ever been arrested outside of Det. Gallagher's jurisdiction. (Pet. Mem. at 25.) However, to allow defense counsel to ask this question would have been to extend the inquiry into Alexander's bad acts beyond Petitioner's knowledge thereof, in violation of <u>Miller</u>. Simply because Det. Gallagher, a police officer with access to criminal records, may have been aware of Alexander's prior specific acts of violence does not mean that Petitioner was also aware of every such act at the time of the shooting. Since the trial court correctly applied <u>Miller</u>, no constitutional violation occurred.[8] Therefore, no error

---

[8] Alternative grounds for the trial court's ruling exist. The trial court may have found evidence of prior arrests, as opposed to prior convictions, not to be probative of prior specific acts of violence. Furthermore, all of Alexander's arrests may not have been for violent offenses.

can be found.

### c. Testimonial Evidence of the Victim's Reputation for Violence

Petitioner argues that the trial court erred when it precluded defense counsel from asking Det. Gallagher whether Alexander had a reputation for violence. (Pet. Mem. at 25.) The reach of the Miller rule is limited to evidence of the victim's prior specific acts of violence and not to evidence of the victim's general reputation for violence. See Miller, 349 N.E.2d at 847. Therefore, the rule set down in Miller does not apply here; rather, the trial court was bound only by New York's general relevancy rules when it made the determination not to admit such testimonial evidence of the victim's reputation for violence.

New York relevancy rules parallel Fed. R. Evid. 401, 402 and 403. Evidence is relevant if it tends to prove the existence or non-existence of a material fact, but "a court may, in its discretion, exclude relevant evidence if its probative value is outweighed by the prospect of trial delay, undue prejudice to the opposing party, confusing the issues, or misleading the jury." People v. Primo, 753 N.E.2d 164, 167 (N.Y. 2001) (internal citation and quotation marks omitted). Evidence "of merely slight, remote or conjectural significance" will ordinarily be insufficiently probative to outweigh these countervailing risks. Id. at 168.

The court disagrees with Respondent that this inquiry into Alexander's reputation for violence is without *any* probative value. (See Assistant District Attorney Diana Villanueva's Memorandum of Law in Opposition to Petition for a Writ of Habeas Corpus ("Res. Mem.") at 10-11.) If Det. Gallagher was aware of Alexander's reputation for violence, Alexander may also have had such a reputation among others, which increases the likelihood that Petitioner, who shared mutual acquaintances with Alexander, may have known about Alexander's propensity for

violence and harbored fear of Alexander on the night of the shooting. Ostensibly, the trial court precluded this question because it rested on the above-described, elongated chain of inferences which, in the trial court's judgment, reduced the probative value of the evidence to "merely slight, remote [and] conjectural significance." Primo, 753 N.E.2d at 168. Under New York's relevancy rules, the probative value of Alexander's prior arrests may be argued to have been outweighed by the unfair prejudice that the jury might overvalue this evidence or condemn Alexander as deserving of his fate. See id. at 164, 167. New York's relevancy rule is not contrary to clearly established federal law; indeed, Primo is a commonplace evidentiary rule similar to its federal counterpart. See Fed. R. Evid. 403. The facts of the instant case differ greatly from that of the cases upon which Petitioner relies, which are not instructive on this issue.[9]

Furthermore, even if the trial court erred in applying the rule, the error was not of a constitutional magnitude. See, e.g., Ojar v. Greene, No. 07-CV-3674 (JG), 2008 WL 428014 (E.D.N.Y. Feb. 15, 2008) (on habeas review, "wide latitude" must be given to the trial court's

---

[9] For example, in Crane, the defendant moved to suppress his confession. 476 U.S. at 684. Following a hearing, the trial court determined that the confession was voluntary and denied the motion. Id. At trial, the sixteen-year-old defendant sought to introduce testimony describing the length of the interrogation and the manner in which it was conducted to show that the confession, which was the principal component of the State's case, was not credible. Id. The trial court ruled that the testimony pertained solely to the issue of voluntariness and was therefore inadmissible. Id. The Supreme Court held that "evidence about the manner of a confession is often highly relevant to its reliability and credibility" not only to its voluntariness. Id. at 685-86. Furthermore, in Chambers, the trial court refused to admit three hearsay statements in which the declarant confessed to a murder with which the defendant had been charged. 410 U.S. at 291-92. Furthermore, the trial court prevented the defendant from cross-examining the declarant, who had since repudiated his confessions. Id. The Supreme Court held that "where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice." Id. at 302.

rulings to exclude evidence pursuant to the state's evidentiary rules).

    **d.**    **Testimonial Evidence of the Victim's Alleged Gang Affiliation**

Petitioner further argues that the trial court violated his right to present a complete defense when it precluded defense counsel from questioning Ms. Alexander about her son's alleged affiliation with the Bloods gang. (Pet. Mem at 25-26.) This ruling was made off the record, but defense counsel referred to the ruling at a later sidebar conference. (Lansing T. at 66.) This relevancy ruling, even if erroneous, did not violate Petitioner's right to present a complete defense. Like the testimonial evidence of Alexander's reputation for violence, the excluded evidence here had relatively little probative value on Petitioner's state of mind. Furthermore, affording the trial court "wide latitude" in its evidentiary rulings, it cannot be held that the trial court unreasonably applied federal law. See Ojar, 2008 WL at 428014.

In the alternative, Petitioner argues that the trial court's off-the-record ruling on Alexander's alleged gang affiliation precluded defense counsel from cross-examining Det. Gallagher about such affiliation. (Pet. Mem at 22.) However, defense counsel was able to ask Det. Gallagher about his investigation of Alexander's supposed Bloods affiliation. (Gallagher T. at 271.) Det. Gallagher responded that "a records search" for Alexander's gang membership yielded no result. (Id.) Therefore, the record does not show error on the part of the trial court.

    **e.**    **Photographic Evidence of the
Victim's Alleged Gang Affiliation**

Petitioner argues that the trial court's exclusion of a photograph of Alexander's memorial bearing the epitaph "Blood 4 Life, R.I.P. ROB" deprived Petitioner of his ability to present a complete defense. New York law has long required a photograph's authentication before allowing its submission into evidence. See Alberti v. New York, Lake Erie & Western R.R. Co.,

23 N.E. 35 (N.Y. 1889). <u>See</u> also <u>People v. Byrnes</u>, 308 N.E.2d 435, 437 (N.Y. 1974); <u>People v. Brown</u>, 216 A.D.2d 737, 738 (N.Y. App. Div. 3d Dep't 1995). "Photographs are authenticated by testimony of a person[, not necessarily the photographer,] familiar with the object portrayed therein that it is a correct representation of such object." <u>Brown</u>, 628 N.Y.S.2d at 836, 216 A.D.2d at 738; <u>accord</u> <u>Byrnes</u>, 308 N.E.2d at 437-38, 33 N.Y.2d at 347-48. In an unpublished opinion, the Second Circuit found that habeas relief was not warranted for preclusion of a photograph which was ruled inadmissible for irrelevancy and for failure to authenticate. <u>Cochrane v. McGinnis</u>, No. 01-CV-2557, 2002 WL 31501358, at *1-2 (2d Cir. Nov. 4, 2002). Additionally, New York's authentication rule bears a high degree of similarity to Fed. R. Evid. 901, which requires "authentication . . . [that] is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims."

In the instant case, Det. Gallagher, who had seen the memorial, did not remember the appearance of the words "Blood 4 Life" and therefore, the trial court ruled that he was not able to authenticate the photograph. (Gallagher T. at 299-302.) Although defense counsel argued that the photographer was too frightened to appear and authenticate the photograph, in the absence of some other individual "familiar with the object" by whom the defense might authenticate the photograph, the trial court correctly ruled the photograph inadmissible. (<u>Id.</u>) <u>See</u> <u>Brown</u>, 628 N.Y.S.2d at 836, 216 A.D.2d at 738.

Neither the New York authentication rule nor the Federal Rules of Evidence provide an exception for the case of a possible authenticator who is too frightened to appear and authenticate an item of evidence. Applying <u>Crane</u>, it is clear the New York authentication rule serves the "interests of fairness and reliability" required for constitutionality. 476 U.S. at 690. Applying

Rock, the authentication requirements satisfy the "legitimate interest in the criminal trial process" of screening unreliable photographs, and authentication is neither "arbitrary" nor does it "disproportionate[ly]" constrict a defendant's right to present a complete defense. 483 U.S. at 55. The rule is not so narrow as to limit authentication only to the photographer. The rule ably ensures that the trier of fact has some evidence linking the photograph to the object other than the submitting counsel's good word. New York's authentication rule, like its federal counterpart, is not contrary to the Constitution, and the trial court did not err in ruling the photograph inadmissible.

 **f.**     **Harmless Error Analysis**

Finally, even if the trial court erred in its evidentiary rulings regarding the admission of evidence concerning Alexander's past criminal record and alleged gang affiliation and the error was of a constitutional magnitude under the "contrary to" or "unreasonable application of" standards, the error would have been harmless nevertheless. Pursuant to N.Y. Penal Law § 35.05, the use of physical force is justified when it is "necessary as an emergency measure to avoid an imminent public or private injury which is about to occur by reason of a situation occasioned or developed through no fault of the actor." An excuse mitigating the crime of Murder in the Second Degree to Manslaughter in the First Degree is available to a "defendant [who] acted under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse." N.Y. Penal Law §§ 125.20, 125.25(a). Both defenses are affirmative in that the defendant has the burden to prove each defense by a preponderance of the evidence. See N.Y. Penal Law § 25.00; see also Patterson v. New York 432 U.S. 197, 210 (1977) (holding that New York's affirmative defense burden shifting is constitutional).

The record is replete with evidence contradicting Petitioner's justification defense and extreme emotional disturbance excuse. The evidence suggests that Petitioner methodically loaded his gun following a confrontation with Alexander (Febre T. at 147-48), that Petitioner shot Alexander while he was facing away from Petitioner (see Knowd T. at 91), that Petitioner fully emptied the gun of its ammunition (Lansing T. at 64; Liota T. at 187), and that Alexander did not have a weapon (Gallagher T. at 230). Petitioner admitted that he had never seen Alexander with a gun (James T. at 337) and that Alexander's threats to harm Petitioner were to be enacted in the future rather than immediately (Febre T. at 144-47, 155-56, 158, 163-65, 172; Gallagher T. at 250, 252). This evidence suggests that Petitioner did not fear immediate harm to himself and his family but rather that Petitioner shot Alexander after deliberate planning and without a reasonable excuse.

Even if Petitioner had been able to introduce additional evidence of Alexander's past acts of violence and gang affiliation, this would not have created a reasonable doubt that Petitioner was guilty of the crimes charged. By introducing this evidence, Petitioner could merely hope to prove by a preponderance of the evidence one or both of the proffered defenses. Given the overwhelming evidence presented against Petitioner at trial, it is clear none of the above evidentiary rulings were "substantial and injurious" to Petitioner's affirmative defenses. In addition, it is clear that he would still have been unable to prove his affirmative defense by a preponderance of the evidence even if he had been able to introduce this evidence. Under either the Chapman or Brecht standard, any error was harmless. Therefore, Petitioner's evidentiary ruling claim is denied.

## 2. Prosecutorial Misconduct during Summation

The Appellate Division held that Petitioner's challenges to the prosecutor's comments made during summation were "[un]preserve[d] for appellate review" and that "in any event, [Petitioner] was not deprived of a fair trial as a result of prosecutorial misconduct." James, 775 N.Y.S.2d at 561. The Appellate Division rested the procedural aspect of its decision on People v. Balls, 503 N.E.2d 1017, 1018 (N.Y. 1986), People v. Hinckson, 699 N.Y.S.2d 435, 436-37 (App. Div. 2d Dept. 1999), and People v. Scotti, 632 N.Y.S.2d 209 (App. Div. 2d Dept. 1995), each of which relied on N.Y. Crim. Proc. Law § 470.05(2). This statute preserves for appellate review only those questions of law as to which "a protest . . . was registered, by the party claiming error, at the time of such ruling or instruction or at any subsequent time when the court had an opportunity of effectively changing the same." N.Y. Crim. Proc. Law § 470.05(2).

It is well established that "federal habeas review is foreclosed when a state court has expressly relied on a procedural default as an independent and adequate state ground, even where the state court has also ruled in the alternative on the merits of the federal claim." Velasquez v. Leonardo, 898 F.2d 7, 9 (2d Cir. 2000); see also Harris v. Reed, 489 U.S. 255, 264 n. 10 (1989); Fama v. Comm'r of Corr. Servs., 235 F.3d 804, 810 n. 4 (2d Cir. 2000) ("where a state says that a claim is 'not preserved for appellate review' and then rules 'in any event' on the merits, such a claim is not preserved"). N.Y. Crim. Proc. Law § 470.05(2) is an adequate and independent state procedural rule. Garcia v. Lewis, 188 F.3d 71, 79 (2d Cir. 1999).

Here, the Appellate Division stated that Petitioner's claims of prosecutorial misconduct were unpreserved pursuant to N.Y. Crim. Proc. Law § 470.05(2). The claim, therefore, has been decided on an independent and adequate state ground. The alternative holding on the merits does

not obviate application of the procedural bar doctrine.  See Harris, 489 U.S. at 264 n.10 ("[A] state court need not fear reaching the merits of a federal claim in an *alternative* holding . . . as long as the state court explicitly invokes a state procedural bar rule as a separate basis for decision") (emphasis in original).  Petitioner's claims of prosecutorial misconduct are therefore procedurally barred from habeas review.

Although these claims have been procedurally defaulted, Petitioner can overcome the procedural bar if he can either (1) demonstrate that the failure to consider the federal claim will result in a fundamental miscarriage of justice, specifically the conviction of an actually innocent person, or (2) show good cause for the default and that he will be prejudiced by non-review of the claim.  See Harris, 489 U.S. at 262; Vargas v. Keane, 86 F.3d 1273, 1280 (2d Cir. 1996). Petitioner has made no such showing; he has neither demonstrated that he is actually innocent, nor has he shown good cause for the default and prejudice therefrom.  As a result, this court need not review the claims on the merits.

Notwithstanding the fact that a review on the merits is unnecessary in light of Petitioner's procedural default, in the interest of being thorough, the court will address the merits of Petitioner's claims of prosecutorial misconduct.  Petitioner's prosecutorial misconduct claim is also denied on the merits.

Habeas relief is warranted on a prosecutorial misconduct claim only if the prosecutor's comments "constituted more than mere trial error, and were instead so egregious as to violate the defendant's due process rights."  Tankleff v. Senkowski, 135 F.3d 235, 252 (2d Cir. 1998); see also Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974) (holding that, in order to grant a habeas petition, the prosecutor's remarks must have sufficiently "infected" the trial so as to make

it fundamentally unfair). To succeed on this claim, Petitioner must show that he "suffered actual prejudice because the prosecutor's comments . . . had a substantial and injurious effect or influence in determining the jury's verdict." Bentley v. Scully, 41 F.3d 818, 824 (2d Cir. 1994). "Habeas relief is not appropriate when there is merely a 'reasonable possibility' that trial error contributed to the verdict." Id. (quoting Brecht, 507 U.S. at 637 (1993)). To determine whether the Petitioner has suffered actual prejudice from any error which may have occurred, the court considers the following: (1) the severity of the prosecutor's conduct; (2) what steps, if any, the trial court may have taken to remedy any prejudice; and (3) the certainty of the conviction absent the prejudicial conduct. See United States v. Friedman, 909 F.2d 705, 709 (2d Cir. 1990); United States v. Biasucci, 786 F.2d 504, 514 (2d Cir. 1986).

Petitioner alleges that the prosecutor's comments about Petitioner's lack of credibility were inflammatory and prejudiced him, and Petitioner urges this court to apply the above three-part inquiry. (Pet. Mem. at 31.) Petitioner's first challenge to the prosecutor's summation is that it was "undeniably wrong of the prosecutor to repeatedly urge the jurors to look for the 'truth'" because the prosecutor's comments "suggested that a conviction was in order, regardless of whether the [P]eople proved [P]etitioner's guilt beyond a reasonable doubt." (Pet. Mem. at 32.) The Supreme Court has long held, however, that when a criminal defendant testifies at trial, his credibility may be impeached and his testimony challenged like any other witness. See, e.g., Brown v. United States, 356 U.S. 148, 154 (1958); accord Portuondo v. Agard, 529 U.S. 61, 69 (2000). Nowhere in his comments did the prosecutor suggest that the State lacked the burden of proof beyond a reasonable doubt. Rather, the prosecutor's request for the jury to seek truth was an attempt to attack Petitioner's lack of credibility and was, consequently, proper. Given the

absence of any error, the above three-part test is not applicable. (See T. at 434, 436, 439.)

Petitioner argues that the prosecutor improperly pressed the matter of Petitioner's credibility when she compared Petitioner's testimony to the "Academy Awards," posited that Petitioner thought he could "sell sand" to desert dwellers, and suggested that Petitioner was engaging in "character assassination" in an attempt to "dirty up" Alexander. (Id. at 428-29.) (See Pet. Mem. at 30) ("Statements designed to appeal to the jury's emotion or to inflame the passions or prejudice of the jury are improper.") (citing United States v. Young, 470 U.S. 1, 11-12 (1985)).) However, applying the above three-part inquiry, none of these comments can be said to have actually prejudiced Petitioner.

First, none of these comments are particularly severe. Unlike the prosecutor's comments in Friedman, for example, which accused defense attorneys, as a class, of circumventing their moral duties to defend drug dealers for high fees, effectively "undermin[ing] the presumption of innocence," the prosecutor's comments in the instant case merely overstated the prosecutor's argument against the defendant's credibility. 909 F.2d at 709.

Second, the trial court sustained defense counsel's objections to two of the most colorful of the above comments. Since the prosecutor's error was merely overstating her legitimate attack on Petitioner's credibility, curative instructions were not necessary.

Third, it is clear that, absent the prosecutor's prejudicial comments, the jury was likely to have reached the same verdict. Two factors militate towards the conclusion that Petitioner would have been convicted in the absence of the challenged comments. First, the alleged prosecutorial misconduct was confined to summation, and thus, even if it were misconduct, it did not affect the entire trial. See Matthews v. Artuz, No. 97-CV-3334 (DC), 1999 WL 349694, at *5 (S.D.N.Y.

May 27, 1999) (denying a claim that the prosecutor made improper comments during summation where they did not "permeate" the trial). Second, as mentioned above in the discussion concerning Petitioner's right to present a complete defense, the evidence overwhelmingly opposed Petitioner's justification and excuse defenses. Particularly of note, Petitioner admitted to lying to the grand jury for the purpose of helping his case. (James T. at 318, 320-22.)

Finally, Petitioner argues that the prosecutor ignored the "cardinal rule that counsel, in summing up, must stay within the four corners of the evidence" since the prosecutor commented that no "red bandanas" were found on Alexander's person and that Alexander did not have any "gang tattoos." (Pet. Mem. at 29; T. at 445.) Neither of these facts, Petitioner argues, were in the record. (Pet. Mem. at 29.) Applying the Second Circuit's three-part test, it should first be noted that this error is more severe than that of overstating an attack on Petitioner's credibility because the prosecutor usurped the witness's role during her summation. Second, the court took no curative measures, probably because defense counsel failed to object. Third, however, these closing comments were not particularly probative on the issue of Petitioner's belief that Alexander was a Bloods gang member at the time of the shooting. Moreover, these comments were limited to summation, and the jury heard overwhelming evidence against Petitioner; thus, the jury was likely to have reached the same verdict. Therefore, none of the prosecutor's comments made during summation, when taken separately or in the aggregate, constitute an "egregious" error or "actual prejudice" against Petitioner. See Tankleff, 135 F.3d at 252; Bentley, 41 F.3d at 824.

For those reasons, Petitioner's claims of prosecutorial misconduct are denied, both on procedural grounds and on the merits.

### 3.    Erroneous Extreme Emotional Disturbance Jury Charge

The Appellate Division held that Petitioner's challenge to the trial court's omission of a part of the extreme emotional disturbance jury charge was "unpreserved for appellate review" and alternatively, "without merit, as the court's charge, when read as a whole, adequately conveyed the legal principles to be applied by the jury in determining whether the defendant had proven by a preponderance of the evidence that he had acted under an extreme emotional disturbance." James, 775 N.Y.S.2d at 562 (internal quotation marks and citation omitted). The Appellate Division rested the procedural aspect of its decision on People v. Udinski, 541 N.Y.S.2d 9, 13 (App. Div. 2d Dept. 1989) which relied on N.Y. Crim. Proc. Law § 470.05(2). As mentioned above in the prosecutorial misconduct discussion, N.Y. Crim. Proc. Law § 470.05(2) is an adequate and independent state procedural rule that bars habeas merit review. See Garcia, 188 F.3d at 79; see also Harris, 489 U.S. at 264 n.10 (noting that a state court's alternative holding on the merits does not obviate the habeas procedural bar). Since Petitioner has not overcome the procedural bar by demonstrating his actual innocence or by demonstrating good cause for the default and the prejudice resulting from an absence of review, this court need not review Petitioner's jury instruction claim on the merits. See Harris, 489 U.S. at 262; Vargas v. Keane, 86 F.3d 1273, 1280 (2d Cir. 1996).

Notwithstanding the fact that a review on the merits is unnecessary, in the interest of thoroughness, the court will address the merits of Petitioner's claim. On the merits, Petitioner's instruction claim is nonetheless denied.

Petitioner argues that his petition should be granted because he was deprived of due process by the trial court's inadvertent omission of a crucial part of the jury charge on extreme

emotional disturbance. (Pet. Mem. at 35.) The New York Criminal Jury Instructions pattern charge for extreme emotional disturbance explains that "[a] preponderance of the evidence means the greater part of the believable and reliable evidence, not in terms of the number of witnesses or the length of time taken to present the evidence, but in terms of its quality and the weight and convincing effect it has." CJI2d [NY] Affirmative Defenses–Extreme Emotional Disturbance. "For the affirmative defense to be proved by a preponderance of the evidence, the evidence that supports the affirmative defense must be of such convincing quality as to outweigh any evidence to the contrary." Id.

To sustain a claim that a jury instruction was improper, Petitioner must show "not merely that the [jury] instruction is undesirable, erroneous, or even universally condemned, but that it violated some right which was guaranteed to the defendant by the Fourteenth Amendment." Cupp v. Naughten, 414 U.S. 141, 146 (1973) (internal quotation marks omitted); accord Davis v. Strack, 270 F.3d 111, 123 (2d Cir. 2001). Thus, an improper charge will be found to violate Petitioner's constitutional rights where "there is a reasonable likelihood that the jury has applied the challenged instruction in a way that "violates the Constitution," Estelle, 502 U.S. at 72, or prevents the consideration of constitutionally relevant evidence." Boyde v. California, 494 U.S. 370, 380 (1990). In evaluating the jury's application of an instruction, "[a]n omission, or an incomplete instruction, is [considered] less likely to be prejudicial than a misstatement of the law." Henderson v. Kibbe, 431 U.S. 145, 155 (1977). It must also be acknowledged that "a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." Cupp, 414 U.S. at 146-47 (citations omitted).

Petitioner argues that the trial court's failure to note the importance of the "greater part of

the believable and reliable evidence" rather than the "number of witnesses or the length of time taken to present the evidence" deprived him of due process. (Pet. Mem. at 36 (<u>citing</u> CJI2d [NY] Affirmative Defenses–Extreme Emotional Disturbance).) However, the trial court charged the jury that "[i]t is the convincing quality of the testimony that controls, not the amount of testimony or the number of witnesses testifying for either side" when it explained how the jurors should generally evaluate witness credibility. (T. at 456.) Moreover, the trial court delivered a correct, albeit incomplete recitation of the pattern charge because it properly defined the defendant's burden of proof as presenting evidence of "sufficient convincing quality in your judgment as to outweigh evidence to the contrary." (T. at 478.) When "viewed in the context of the overall charge," it is clear that the trial court's omission fell far short of "infecting" the entire trial. Cupp, 414 U.S. at 146-47.

Petitioner alleges, following the verdict, jury members explained to defense counsel that the jury believed that Petitioner needed to produce other witnesses to satisfy his burden on the extreme emotional disturbance defense. (Pet. Mem. at 38.) The court is unable to consider an alleged off-the-record conversation. However, even if Petitioner's contention is accurate, it cannot be inferred from the jury members' statements that the jury believed that Petitioner was legally required to corroborate his testimony with additional evidence. A more likely interpretation is that the jury simply was not convinced by the quality of Petitioner's testimony and absent other evidence supporting Petitioner's extreme emotional disturbance defense, the jury decided not to accept the defense. Furthermore, as the alleged defect in the jury instruction was merely an omission, rather than a misstatement, it is not reasonably likely that the jury applied the charge in a manner that violates the constitution. <u>See</u> <u>Henderson</u>, 431 U.S. at 155.

Petitioner's jury instruction claim is therefore denied, both procedurally and on the merits.

## III.    Conclusion

For the reasons discussed above, Petitioner's petition for a writ of habeas corpus is denied.  A certificate of appealability shall not issue.  The Clerk of Court is directed to close the case.


SO ORDERED.

Dated: June 30, 2008                                              /s Nicholas G. Garaufis
      Brooklyn, New York                              NICHOLAS G. GARAUFIS
                                          United States District Judge